IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LUCKY STEVENS,
      Plaintiff,

vs.                            Case No. 3:08cv288/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Lucky Stevens for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

Plaintiff's applications for DIB and SSI were denied initially and on reconsideration (Doc. 14 (transcript of Social Security Administration (hereafter "Tr.")) at 43–44, 488–94). On August 1, 2003, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he

found that Plaintiff was not under a "disability" as defined in the Act (Tr. 48–56). On March 2, 2004, the Appeals Council of the Social Security Administration ("SSA") remanded the case to an ALJ for further consideration (Tr. 104–07). On March 22, 2006, after obtaining additional evidence and holding another hearing, an ALJ again rendered a decision in which it was determined that Plaintiff was not under a "disability" as defined in the Act (Tr. 18–42). Plaintiff again sought review by the Appeals Council, but review was denied on May 23, 2008 (Tr. 8–11). Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court. Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     FINDINGS OF THE ALJ

On March 22, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 21–42):

1)      Plaintiff met the disability insured status requirements of the Act on August 1, 2000, the date he alleges he became disabled, and he continued to meet them through December 31, 2005.[1]

2)      Plaintiff has not engaged in substantial gainful activity since August 1, 2000.

3)      Plaintiff has the severe impairments of degenerative disc disease ("DDD") of the cervical spine, status post anterior cervical fusion secondary to disc herniations at C5-6 and C6-7, DDD of the lumbar spine, status post lumbar intradiscal electrothermal annuloplasty ("IDET"), hypertension, bilateral sensorineural hearing loss, major depressive disorder with psychotic features, and mood disorder secondary to chronic pain; however, he does not have an impairment or combination of impairments, listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4)      Plaintiff's allegations of pain and functional limitations to the degree alleged are not supported by the evidence in the record.

5)      At all relevant times, Plaintiff possessed the residual functional capacity ("RFC") to perform a wide range of unskilled work activities at the medium exertional level.

---

[1] Thus, the time frame relevant to Plaintiff's claim for DIB is August 1, 2000 (alleged onset) to December 31, 2005 (date last insured).

6)      At the time of his alleged onset of disability, Plaintiff was forty-two years old (a "younger person," as defined by the regulations) with a "high school" level of education, but he is functionally illiterate.

7)      Plaintiff is unable to return to any of his past relevant work, but he is able to make an adjustment to other work existing in significant numbers in the national economy.

8)      Plaintiff has not been under a "disability," as defined in the Act, at any time through March 22, 2006, the date of the ALJ's decision.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen,

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.   PLAINTIFF'S RELEVANT MEDICAL HISTORY

A.   Treating Physicians

(1)   Dr. Fleet

As previously noted, Plaintiff alleges disability commencing August 1, 2000, and the earliest medical record in Plaintiff's file is dated shortly thereafter, August 17, 2000 (Tr. 258). On that date Plaintiff sought treatment by W. Shepherd Fleet, M.D. (*id.*). Plaintiff reported being struck in the back on August 1, 2000, by a heavy power block in a work-related accident, and he complained of mild headaches, numbness in his feet, and constant, throbbing, lower and mid-back pain which prevented him from sitting or standing for long periods (*id.*). He also reported that pain kept him awake at night and that Lortab, previously provided to Plaintiff when he was seen in an emergency room, was not helping (*id.*). A neurological examination was unremarkable, "review of systems" was negative, motor and sensory examinations were normal, and straight leg raises ("SLR") were negative bilaterally (*id.*). Dr. Fleet's impression was lumbar radiculitis, and Plaintiff was prescribed Vioxx and Carbatrol (*id.*). When Plaintiff returned on September 7, 2000, he reported throbbing thoracic pain, intermittent neck pain, lower back pain with occasional radiation to his legs, and headaches, but he noted that he was getting adequate sleep (Tr. 252). Plaintiff saw Dr. Fleet on four more occasions, through November 17, 2000 (*see* Tr. 244–51). Dr. Fleet continued to treat Plaintiff conservatively with medications, and while under Dr. Fleet's care, Plaintiff underwent diagnostic testing, including electromyogram ("EMG") and nerve conduction velocity ("NCV") tests of the lower extremities, the results of which showed possible early neuropathy (Tr. 253–55). At Plaintiff's last visit with Dr. Fleet he complained of "excruciating" pain, and he reported that his medications were making him feel weak and he was sleeping thirteen to fourteen hours per day (Tr. 245). In addition to lumbar radiculitis, Plaintiff was diagnosed with cervical radiculitis following his last visit (*see* Tr. 244).

(2)   Dr. Tarabein

On November 28, 2000, Plaintiff began seeing R.M. Tarabein, M.D., a neurologist and pain management physician (Tr. 300). Plaintiff reported being hit in the back by a baseball bat in August 2000 (*id.*). Plaintiff primarily complained of "excruciating" neck and low back pain that radiated to both arms and legs, bilateral hand numbness in the fourth and fifth fingers, grip weakness, and dizziness (*id.*). Plaintiff's physical examination was remarkable for spasms with stiffness and tenderness in the neck and mid to lower back, mild sensory deficit in both hands with positive Tinel and Phalen signs, and slightly depressed reflexes on the left arm and leg, but the remainder of the examination was within normal limits (*see* Tr. 301–02). Dr. Tarabein concluded that Plaintiff's signs and symptoms were most consistent with "neuralgia/neuritis secondary to cervical and/or lumbosacral radiculopathy/radiculitis," cubital tunnel syndrome, and carpal tunnel syndrome (Tr. 302). Dr. Tarabein ordered diagnostic testing, including EMG and NCV studies, heart monitoring, and Doppler studies (*id.*). The results of the heart monitoring were essentially within normal limits except for an artifact and sinus rhythms (Tr. 298). The other studies showed findings consistent with mild bilateral cubital tunnel syndrome and mild C7, C8-L5, and S1 radiculopathy and did not completely exclude neuropathy and/or myopathy (Tr. 292). Dr. Tarabein's records also reflect that he began treating Plaintiff with a combination of lumbar blocks and narcotic pain medication, including Oxycontin (*see, e.g.*, Tr. 285, 294). Additionally, throughout his treatment with Dr. Tarabein Plaintiff completed "Pain Comfort Assessment Guides," on which he described the type and level of pain he experienced and the amount of relief provided by the blocks and Oxycontin. Plaintiff generally reported near or complete pain relief (*see, e.g.*, 275, 280, 283, 285, 295), although on one occasion—when only the Oxycontin was considered—Plaintiff indicated he had no pain relief (Tr. 287). At a follow-up visit on June 5, 2001, Dr. Tarabein noted Plaintiff's report that, although he continued to have neck pain that radiated to both arms, as well as tenderness in his neck and low back, he was 60–70% improved (Tr. 276). Dr. Tarabein indicated that Plaintiff's improvement was "remarkable," that Plaintiff was able to return to work with some restrictions, and that over time Plaintiff would be able to work again at full duty with no restrictions (Tr. 276–77). At Plaintiff's last visit, on December 14, 2001, Dr. Tarabein completed a form on which he indicated that Plaintiff was restricted from all work from November 27, 2001, through January 26, 2002 (Tr. 273).         (3)     Dr. Yearwood

Plaintiff began treatment with Amrita Yearwood, M.D., on December 28, 2000, at the same time he was seeing Dr. Tarabein, and was assessed with low back pain (Tr. 268). As previously noted, Plaintiff was prescribed Oxycontin by Dr. Tarabein, but the record reflects he was also receiving pain medications, including Lortab, as well as muscle relaxers and injections from Dr. Yearwood (*see* Tr. 259–68). When Plaintiff returned to Dr. Yearwood on January 4, 2001, she noted mild tenderness in Plaintiff's low back but saw no evidence of any neurologic deficit (Tr. 267). Plaintiff was referred for physical therapy (*id.*), although there is no indication in the file that Plaintiff actually attended physical therapy as recommended. Dr. Yearwood treated Plaintiff through May 25, 2001, and she continued prescribing medications for his complaints of low back pain, muscle spasm, and hypertension.

(4)     Dr. Vogel

Plaintiff first presented to K.E. Vogel, M.D., a neurologic surgeon, on August 12, 2002 (Tr. 347).[3] Plaintiff's chief complaints were cervical, left arm, and lumbosacral pain (*id.*). Examination of the cervical spine revealed a mild degree of limitation of motion in all directions with cervical facet tenderness on the left and a moderate degree of bilateral muscle spasm (*id.*). Motor examination was normal except for reduced grip on the left, and sensory and reflexes were normal (*id.*). Examination of the lumbosacral spine revealed bilateral lumbar facet tenderness, a moderate degree of limitation of motion in all directions with flexion limited to forty-five degrees, moderate bilateral muscle spasm, mild scoliosis, and a positive SLR at 70 degrees, but motor and sensory examinations and reflexes were within normal limits (Tr. 348). Dr. Vogel's diagnostic impressions were suspected segmental lumbar instability and herniated cervical disc versus segmental cervical instability, and Plaintiff was deemed "disabled for normal duties" (*id.*). Plaintiff was advised to continue conservative care, including physical therapy (but again, the file contains no evidence that Plaintiff attended physical therapy as recommended), and Dr. Vogel recommended that he undergo cervical and lumbar spine magnetic resonance imaging ("MRIs") (*id.*).

A cervical MRI scan was performed on August 12, 2002, and the results showed evidence of significant anterior and posterior spondylitic change at C5-6 and C6-7 with two to three

---

[3] Plaintiff apparently did not seek treatment between December 14, 2001, the day he last saw Dr. Tarabein, and August 12, 2002, the day he first saw Dr. Vogel, as the file contains no treatment records from that time frame.

Case No. 3:08cv288/RV/EMT

millimeters of posterior and inferior disc herniation at both levels, and spondylitic changes with disc herniation encroaching upon the right C5 and C6 neural foramina and, to a lesser degree, spondylitic change encroaching upon the anterior aspect of the right C6 neural foramen (Tr. 346).

Plaintiff returned to Dr. Vogel on September 2, 2002 (Tr. 343). Dr. Vogel conducted a physical examination and reviewed the cervical MRI (*id.*). His impressions were suspected herniated cervical disc, herniated lumbar disc versus symptomatic lumbar DDD, and mild left rotator cuff bursitis (*id.*).

Computerized tomography ("CT") scans of the lumbar spine obtained on October 22, 2002, revealed mild disc space narrowing at L5-S1, consistent with DDD (Tr. 340), and loss of disc space height from C5-6 to C7-T1 with associated degenerative changes, including changes at the C5-6 neuroforamina (Tr. 338). CT scans of the cervical spine obtained on January 7, 2003, revealed degenerative changes with osteophytes impinging to a moderate degree on the right neural foramina at C5-6 and C6-7 (*id.*), and disc disease primarily at C4-5, C5-6, and C6-7 with central bulging disc material and spondylitic ridging producing mild spinal stenosis and flattening of the cervical cord at C5-6 and C6-7 (Tr. 336–37). A cervical myelogram, also obtained on January 7, revealed prominent extradural defects at C5-6, C6-7, and to a lesser extent at C4-5, presumably reflecting a combination of posteriorly bulging disc material and spondylitic ridging (Tr. 333). A second CT of the lumbar spine, obtained on January 7, revealed mild degenerative changes, most apparent at L5-S1 (Tr. 335). Additionally, discography of the L3-4, L4-5, and L5-S1 disc spaces resulted in abnormal findings at L3-4 and L4-5 and a mildly abnormal finding at L5-S1 (Tr. 330–31).

Based on the forgoing test results Dr. Vogel performed an anterior cervical fusion and lumbar IDET on January 8, 2003 (Tr. 315). Plaintiff tolerated the procedures without difficulty, his postoperative course was uneventful, and he was discharged in satisfactory condition on January 10, 2003, with a final diagnosis of lumbar DDD (Tr. 314, 320). At the time of Plaintiff's discharge, Dr. Vogel estimated that the length of Plaintiff's disability would be approximately three to six months (Tr. 314).

At Plaintiff's post-surgical evaluation on February 25, 2003, Dr. Vogel noted that Plaintiff reported only mild intermittent right leg pain and mild lumbosacral, cervical, and left arm pain (Tr. 358). Moreover, lumbosacral and cervical examinations revealed only mild limitation of motion in

all directions with mild muscle spasm (*id.*). On February 24, 2003, the day before Plaintiff's post-surgical evaluation and examination, Dr. Vogel completed a Physical Capacities Evaluation ("PCE") (Tr. 356). Dr. Vogel opined that Plaintiff could not perform any significant exertional activities, and he could sit, stand, or walk for only one hour in an eight-hour workday (*id.*). In a letter dated May 9, 2003, Dr. Vogel opined that Plaintiff had not yet fully recovered from his surgery and remained "totally disabled for gainful employment" (Tr. 378).

On April 23, 2004, Dr. Vogel completed a Clinical Assessment of Pain form, on which he opined that Plaintiff's pain was "present but does not prevent functioning in everyday activities or work" and that Plaintiff's medications could "cause side effects which impose some limitations upon [Plaintiff] but not to such a degree as to create serious problems in most instances" (Tr. 432). Additionally, in a letter dated April 28, 2004, Dr. Vogel noted that Plaintiff underwent surgery on January 8, 2003, and it was his impression that Plaintiff "incurred a 20% permanent partial total body impairment" (Tr. 433). He further noted that Plaintiff was advised to permanently avoid activities requiring him to lift, push, or pull more than fifty pounds and activities involving repeated flexion or extension of the neck or repeated bending at the waist (*id.*).

(5)     Dr. Roberts

Plaintiff presented as a new patient at the Tri-County Medical Center Clinic on September 25, 2003, and was seen by G.R. Roberts, M.D., a general and family practitioner (Tr. 393, 399). Plaintiff complained of severe back pain, pain in the left shoulder, arm and hand, and pain in both legs, worse on the left leg (Tr. 399). At his initial visit, Dr. Roberts noted that Plaintiff had been denied Social Security benefits and that he "does have lots of problems and looks like in my opinion he is unable to work" (*id.*). A physical examination revealed that Plaintiff could not move his neck in all directions without some discomfort, and he had paravertebral spasms in the cervical spine with any type of motion (Tr. 400). Plaintiff's left knee had some crepitation on flexion and extension (*id.*).[4] Dr. Roberts prescribed Lortab, a pain reliever, and Soma, a muscle relaxant (Tr. 401). Plaintiff returned on October 22, 2003, and saw Ramon Chua, M.D., a colleague of Dr. Roberts (Tr. 398). Plaintiff complained of back and neck problems, including back tenderness and neck spasms

---

[4] Crepitus is a "clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound under the skin, around the lungs, or in the joints." *See* http://www.medterms.com/script/main/art.asp?articlekey=12061

Case No. 3:08cv288/RV/EMT

(*id.*). Dr. Chua noted that Plaintiff had degenerative joint disease ("DJD"), status post anterior cervical laminectomy by Dr. Vogel, and that prior to the laminectomy an MRI showed anterior and posterior spondylitic changes at C5-7 (*id.*). Plaintiff was assessed with partial hearing loss on both sides; DJD of the neck and cervical and lumbar spine, status post anterior cervical laminectomy, and depression (*id.*). Plaintiff's Lortab and Soma were continued (*id.*). Plaintiff returned on October 28, 2003, and saw Dr. Roberts, who noted that Plaintiff was doing "pretty well" on Lortab and Soma (Tr. 397). Dr. Roberts also noted that Plaintiff continued to have paravertebral spasms and back tenderness; he also had a positive SLR on the left at fifty degrees and a "questionable positive" SLR on the right at sixty degrees, as well as tenderness over the sacroiliac joints and sciatic nerve (*id.*). Plaintiff's prescriptions were renewed, and Plaintiff—who at 6'1" then weighed 286 pounds—was encouraged to lose weight, exercise, and begin a low salt diet (*id.*). On December 12, 2003, Plaintiff returned and saw Dr. Chua (Tr. 396). Plaintiff mentioned that he was in the process of seeking disability (*id.*). Dr. Chua noted that he would order certain blood tests, renewed Plaintiff's prescriptions, and told Plaintiff to return in one month (*id.*). Plaintiff returned on January 7, 2004, at which time Dr. Chua noted that the blood work had been done, and the only notation regarding the results was that "blood sugar was 120 which [is] normal" (Tr. 395). Plaintiff's Lortab and Soma prescriptions were renewed, and he was provided with samples of Vioxx, an anti-inflammatory (*id.*). Plaintiff returned on April 1, 2004, and reported that he had fallen, injured his right knee, and was having "some problems" with the knee, such as "getting around pretty slowly" (Tr. 405). At this visit Dr. Roberts indicated that he now had all of Plaintiff's records, including those from Dr. Vogel, and he renewed Plaintiff's prescriptions and added trazodone, an antidepressant (*see id.*).[5] The remainder Dr. Roberts's notes are generally the same as before, except on the April 1 visit he additionally noted that Plaintiff had a herniated lumbar disc with DDD and opined that Plaintiff was "completely and totally disabled to work" (Tr. 406). Plaintiff—who then weighed 296 pounds—was again advised to lose weight (Tr. 405).

     Plaintiff next saw Dr. Roberts on May 3, 2004 (Tr. 404). Plaintiff reported that his legs were "hurting," and he had pain in his low back and right knee (*id.*). Dr. Roberts noted that Plaintiff had

---

[5] Vioxx was apparently discontinued after Plaintiff reported that it was ineffective ( *see* Tr. 405).

"a lot of pain" over his low back with spasms and pain when pressure was placed on the low back (*id.*). Dr. Roberts also noted that Plaintiff's right knee was swollen and painful (*id.*). On June 1, 2004, Dr. Roberts indicated that Plaintiff wanted "to talk about his right knee" and reported that he was "still hurting in his back" (Tr. 443). Plaintiff, who then weighed 299 pounds, was assessed with chronic bursitis in both knees, DDD, DJD, spondylitic changes in the cervical spine, changes in the dorsal spine, herniated disc in the cervical spine, bursitis in the left rotator cuff, and severe pain in the neck and lower lumbar spine with paravertebral spasms (*id.*). Dr. Roberts noted that Plaintiff's right knee was swollen, but it was "better than [before] because we aspirated it the last time and put a shot of steroid in it" (*id.*). Additionally, Dr. Roberts noted that Plaintiff had trouble getting around and getting up and down from sitting and lying positions, had to use a cane, and was "totally and permanently disabled" (*id.*). Lastly, Dr. Roberts renewed Plaintiff's prescriptions and added verapamil for control of Plaintiff's blood pressure (Tr. 444).

Plaintiff returned on July 12, 2004 (Tr. 441). Dr. Roberts stated that although Plaintiff previously underwent an anterior cervical laminectomy, his MRI revealed spondylitic changes (*id.*). Dr. Roberts again noted Plaintiff's neck pain with paravertebral spasms and severe low back pain, especially over L3, L4, and L5 (Tr. 441–42). Additionally, Dr. Roberts noted "slight swelling in both knees, probably no change in the different areas," as well Plaintiff's use of a crutch "mainly on the right side because it takes some of the pressure off his back" and a positive right SLR (*id.*). In relevant part, Plaintiff was assessed with DDD, status post surgery of cervical spine, chronic muscle spasms in the back, and mild hearing loss in the left ear (Tr. 442). Plaintiff next saw Dr. Roberts on September 13, 2004, at which time he stated that Plaintiff had "DDD of the neck, cervical spine, and lumbar spine," spondylitic changes, and "some swelling of the knees" (Tr. 440), but he noted that he thought Plaintiff was "doing well" (*id.*). Plaintiff returned on October 14, 2004, and it was noted that Plaintiff had likely "strained himself," was in "a good bit of back pain," and reported that when his pain got "this bad" he used an assistive device for walking (Tr. 438). Plaintiff's weight had increased to 301 pounds (*id.*). Plaintiff's medications generally remained the same (*see, e.g.*, Tr. 440, 439).

A report from the Tri-County Medical Center dated November 16, 2004, notes that Plaintiff weighed 306 pounds, and his chief complaints were back pain and hypertension (Tr. 436–37). The

report also notes that Plaintiff had no functional limitations in activities of daily living, such as shopping, dressing, or preparing meals; was in no pain; and had not experienced pain in the last week(s) or months(s) (Tr. 436).

In further treatment notes dated December 13, 2004, Dr. Roberts noted that Plaintiff had pain in the low back with paravertebral spasms and tenderness in the posterior cervical spine with pain over C2-3 and C3-4 (Tr. 484). Dr. Roberts also noted that Plaintiff had swelling in both knees with crepitation on flexion and extension (*id.*). In treatment notes dated January 11, 2005, Dr. Roberts stated as follows:

> He is having severe low back pain. He has lots of problems in his neck especially around C2-3 and C3-4. He has some problems in C5-6 and C6-7 which are probably worse than all of it. He has disc herniation with encroachment at C5 and C6. He has a lot of problems in his low back which sometimes disables him from anything.

(Tr. 483).

Dr. Roberts further noted, again, that Plaintiff had "a lot of pain" in the low back with paravertebral spasms, and his knees were swollen with crepitation on flexion and extension (*id.*). Dr. Roberts assessed Plaintiff with cervical and lumbar disc syndrome, osteoarthritis, DDD, hypertension, and probable bipolar disorder (*id.*).

On February 15, 2005, Dr. Roberts noted that Plaintiff was "doing well," although he continued to have neck and back pain with related tenderness and spasms (*see* Tr. 482). Dr. Roberts noted that Plaintiff weighed 299.5 pounds, and Plaintiff was again advised to lose weight (*see id.*). Dr. Roberts's assessments were cervical and lumbar disc disease and rotator cuff injury (Tr. 481). Plaintiff's knees were not mentioned during this visit (*see* Tr. 481–82), but at his visit on March 24, 2005, Dr. Roberts noted that Plaintiff had a "terrible time with his back and his knees," as well as other problems, including possible depression, back and neck pain, pain radiating down the right leg, positive SLR at thirty-five to forty degrees, and pain in the left knee with flexion and extension (Tr. 480). Plaintiff was assessed with chronic neck pain secondary to post discectomy and fusion, chronic back pain, "probably secondary to lumbar disc with nerve root compression radiculopathy," hypertension, depressive disorder, post lumbosacral epidural blocks, symptomatic lumbar DDD, and herniated cervical disc with neck surgery (Tr. 479). On April 18, 2005, Dr. Roberts noted that Plaintiff had significant tenderness over most of the lumbar area with paravertebral spasms, as well

as pain over the sacroiliac joints, worse on the left, but deep tendon reflexes were normal (Tr. 478).
Plaintiff's medications generally remained the same (*see* Tr. 477, 479, 481, 484).

On April 28, 2005, Dr. Roberts again noted that Plaintiff had severe pain in his low back
with paravertebral spasms (Tr. 475).  He additionally noted that Plaintiff's right knee was swollen
and tender, and Plaintiff could "hardly flex it" (*id.*).  Plaintiff reported that he had used a cane more
during "the last few days" because he was "giv[ing] more" to the right knee, which caused his back
to hurt (*id.*).  Dr. Roberts aspirated Plaintiff's right knee, advised Plaintiff to stay off the knee for
twenty-four hours, and diagnosed Plaintiff with bursitis of the right knee (Tr. 475–76).  Plaintiff
returned on June 6, 2005, with complaints of right knee pain and severe back pain (Tr. 473).  Dr.
Roberts noted that he had reviewed Plaintiff's x-rays, but he did not have all of Plaintiff's records
"as of yet," and he did not know whether Plaintiff had undergone a "lumbar laminectomy or not"
(Tr. 473–74).  On July 13, 2005, Plaintiff returned with a primary complaint of blood in his stool,
although Plaintiff's other problems and diagnoses—with the exception of any problems or diagnosis
related to his knees—were also noted (Tr. 471–72).  At this visit Plaintiff was additionally diagnosed
with chronic pain syndrome (Tr. 471).  On August 16, 2005, Dr. Roberts noted that Plaintiff had
chronic low back pain and right knee pain and that Plaintiff's right knee stayed swollen and hurt him
most of the time (Tr. 470).  Plaintiff returned to Dr. Roberts on November 16, 2005, and reported
"a lot of pain in his low back" and stated that "[h]e can hardly get around" (Tr. 468).  Plaintiff
weighed 305 pounds and "couldn't even get on the [examination] table" (*id.*).  Plaintiff's usual
complaints of back pain,  neck pain, and paravertebral spasms were noted, but problems related to
Plaintiff's knee were not mentioned (*id.*).  Plaintiff's medications generally remained the same (*see*
Tr. 468, 473, 475)

Finally, during the course of Plaintiff's treatment, Dr. Roberts completed three Clinical
Assessment of Pain forms and a PCE form, which will be summarized, *infra*, in the "Discussion"
section of this Report and Recommendation.

B.      Consultative Examination

On September 1, 2004, at the request of the SSA, Plaintiff underwent a consultative
examination by C.W. Koulisis, M.D., a board-certified orthopaedic surgeon (Tr. 407, 414).  In
addition to examining Plaintiff, Dr. Koulisis reviewed the medical records of Dr. Vogel and Dr.

Roberts (Tr. 407).  Dr. Koulisis noted Plaintiff's complaints of generalized neck and back pain with no radicular pain, although Plaintiff complained of numbness in his entire left arm (*id.*).[6]  Upon physical examination, Dr. Koulisis observed that Plaintiff arose without difficulty and upon standing had normal thoracic kyphosis and cervical and lumbar lordosis (Tr. 408).  Additionally, Plaintiff had a normal gait and was able to heel, toe, and tandem walk without difficulty (*id.*).  Examination of the cervical spine showed a well-healed left anterolateral incision, negative Spurling's, no palpable spasm, and normal motor strength (5/5), reflexes, and sensation (*id.*).  Examination of the shoulders, elbows, wrists, and hands revealed no abnormal findings (*id.*).  Examination of the thoracolumbar spine showed no palpable spasm, and normal motor strength (5/5), reflexes, and sensation, and similarly, examination of the hips, knees, ankles, and feet revealed no abnormalities (Tr. 408–09).  Dr. Koulisis's impression was "status post C5-6, C6-7 anterior discectomy interbody fusion" and status post lumbar IDET (Tr. 409).  He stated that, while Plaintiff continued to complain of residual symptomatology, objectively he was neurologically intact in the upper and lower extremities (*id.*).  Dr. Koulisis completed a form regarding Plaintiff's ability to do work-related physical activities (*see* Tr. 410).  He opined that Plaintiff could continuously lift and carry up to ten pounds, frequently lift and carry eleven to twenty pounds, and occasionally lift and carry twenty to fifty pounds (*id.*).  He found no limitation in Plaintiff's abilities to sit, stand, walk, or use his hands and feet (Tr. 411).  He further opined that Plaintiff could continuously balance, reach, handle, feel, hear, and speak, and frequently climb, push, and pull (Tr. 412).  Lastly, Dr. Koulisis restricted Plaintiff's abilities to stoop, crouch, kneel, and crawl to "occasionally" and, with respect to environmental limitations, opined only that Plaintiff should avoid concentrated exposure to vibration (Tr. 412–13).

V.    DISCUSSION

Plaintiff raises several issues in the instant appeal, which the undersigned has rearranged for organizational purposes.  Plaintiff first asserts the ALJ erred in failing to find Plaintiff's knee condition a severe impairment.  Next, Plaintiff contends the ALJ erred in rejecting the opinions of Dr. Roberts, a treating physician (and further erred in finding Plaintiff capable of performing medium and light work because these findings are based on the rejection of Dr. Roberts's opinions).

---

[6] Of note, Plaintiff made no complaint regarding his knees (*see* Tr. 407).

Lastly, Plaintiff contends that the ALJ erred in failing to pose a complete hypothetical question to the Vocational Expert.

###### A.      ALJ's Finding that Plaintiff's Knee Condition is Non-Severe

The ALJ acknowledged that Plaintiff was diagnosed with DJD of the right knee but concluded that the objective medical evidence did not support a finding that this impairment "entailed significant work-related limitations for a continuous period of 12 months during the relevant period under consideration" (Tr. 30).  Plaintiff contends the ALJ erred and essentially argues that Dr. Roberts's treatment records support a finding of severity at step two, including those records that document knee swelling and pain, crepitation on flexion and extension, bursitis, and aspiration of Plaintiff's right knee (*see* Doc. 16 at 24).

At step two of the sequential evaluation process, the claimant must prove that he is suffering from a severe impairment or combination of impairments, that have lasted (or must be expected to last) for a continuous period of at least twelve months, and which significantly limit his physical or mental ability to perform "basic work activities."  *See* 20 C.F.R. §§ 404.1509, 404.1520(c) 404.1521(a).  Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, and capacities for seeing, hearing, and speaking, as well as mental functions, not at issue here.  20 C.F.R. § 404.1521(b).  An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account.").  Although the claimant carries the burden at step two, the burden is mild.  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ( "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected.").  A claimant need only show that his "impairment is not so slight and its effect is not so minimal."  *Id.*

Here, in support of the "non-severe" finding, the ALJ acknowledged that after Plaintiff's fall in April 2004 he was diagnosed by Dr. Roberts with "bursitis/degenerative joint disease of the right knee" (Tr. 30). The ALJ also noted that in May 2004 Plaintiff's knee was aspirated and injected with a steroid medication, and that in June 2004, Dr. Roberts noted improvement in the knee, although it was still swollen (*id.*). The ALJ further stated that even though Plaintiff's knees were "intermittently swollen" during subsequent office visits, Dr. Roberts did not prescribe anti-inflammatory medication or obtain x-rays or other diagnostic tests, and he did not need to aspirate or inject the knee again until April 2005 (*id.*). The ALJ then concluded:

> Since there are no consistent clinical examination findings or diagnostic test results establishing the presence of a medically determinable impairment of [Plaintiff's] knees and no objective evidence of even a minimal amount of functional limitation caused by Plaintiff's intermittent knee swelling, the [ALJ] does not find that [Plaintiff] possess [sic] a severe physical impairment relative to his knees.

> Taking into consideration the lack of objective medical evidence supporting the existence of any significant functional restrictions caused by . . . the [] alleged impairment[], the [ALJ] does not find that the allegations of the [] impairment[] have been established as causing any actual 12-month functional work-related limitation, and that the alleged impairment[] [is] not severe.

(Tr. 30–31).

Initially, the court notes that Plaintiff first reported right knee pain on April 1, 2004, after a fall, nearly four years after the date he alleges he became disabled[7] (Tr. 405). When Plaintiff returned to Dr. Roberts on May 3, 2004, his right knee was swollen and painful, but Dr. Roberts aspirated the knee and administered a steroid injection (*see* Tr. 404). At Plaintiff's next visit, on June 1, 2004, although Plaintiff was diagnosed with chronic bursitis, Dr. Roberts noted that the knee was better since being aspirated (Tr. 443). While subsequent visits revealed "some" or "slight" swelling in the knee (*see, e.g.*, Tr. 441 (July 2004), Tr. 440 (September 2004)), Dr. Roberts noted that Plaintiff was doing well (*see, e.g.*, Tr. 440, 482). Moreover, as the ALJ noted, no diagnostic tests, such as MRIs or x-rays exist to establish the presence of DJD, and no such tests were ordered

---

[7] Although in September 2003 Plaintiff's left knee exhibited some crepitation on flexion and extension, Plaintiff did not complain of any knee pain or functional limitations related to the crepitus (*see* Tr. 400). Moreover, in support of the instant claim, Plaintiff references only the treatment notes of Dr. Roberts from June 1, 2004, forward (*see* Doc. 16 at 23–24).

by Dr. Roberts. Likewise, Plaintiff was not prescribed anti-inflammatory medication for the swelling, as the ALJ noted, and no treatment—other than aspirations and/or steroid injections—was ever recommended or deemed necessary by Dr. Roberts. Furthermore, it appears that Plaintiff's bursitis was effectively controlled by the conservative treatment regimen provided by Dr. Roberts, as the first aspiration and injection resulted in noticeable improvement, not only as noted by Dr. Roberts, but also as documented by Dr. Koulisis in September 2004 (in relevant part, Dr. Koulisis reported that Plaintiff had a normal gait, could rise without difficulty and heel, toe, and tandem walk without difficulty, and a thorough examination of Plaintiff's knees revealed no abnormalities) (*see* Tr. 408). Additionally, although Plaintiff reported back pain, neck pain, and left arm numbness to Dr. Koulisis, he made no mention of any problems related to his knees (*see id.*). The record further reveals that Plaintiff did not need a second aspiration until May 2005, and between the first and second aspiration Plaintiff did not mention, and Dr. Roberts did not note, pain or problems related to Plaintiff's knees at every office visit (*see, e.g.*, Tr. 481–82 (February 2005), Tr. 477–78 (mid-April 2005)). Similarly, although Plaintiff's knees were noted to be swollen at certain office visits with Dr. Roberts, Plaintiff generally did not report any associated pain or functional limitations at those visits (*see, e.g.*, Tr. 484 (December 2004), Tr. 483 (January 2005)). In late-April 2005, however, Plaintiff specifically reported pain associated with the swelling of his right knee, and a second aspiration was performed (Tr. 475–76). Following the second aspiration, Plaintiff was advised to stay off the knee for only the next twenty-four hours (Tr. 476). Although Plaintiff reported some knee pain in June 2005 (*see* Tr. 473), at his next visit in July 2005 he made no mention of any pain or functional limitations related to the knee (Tr. 471–72). Plaintiff again reported knee pain at an August 2005 visit (Tr. 470), but he made no such report at his next visit in November 2005 (Tr. 468).

Based on the foregoing, the undersigned concludes that the ALJ's finding that Plaintiff's knee condition did not entail significant work-related limitations for a continuous period of twelve months during the relevant time frame has substantial support in the record. The ALJ's related finding, that the record lacks evidence that Plaintiff was functionally limited by the intermittent knee swelling is similarly supported by the record. Indeed, as previously noted, Dr. Roberts imposed no restrictions related to Plaintiff's knees, except for advising Plaintiff to stay off the knee for a mere

twenty-four hours following the second aspiration, and Dr. Koulisis observed no abnormalities or functional limitations related to Plaintiff's knees.  *See* <u>Sellers v. Barnhart</u>, 246 F. Supp. 2d 1201, 1210 (M.D. Ala. 2002) (in finding plaintiff's back pain and gout non-severe, ALJ considered that none of plaintiff's physicians imposed physical limitations).  Likewise, the ALJ correctly noted the lack of objective medical evidence supporting a diagnosis of DJD.[8]  *See* 20 C.F.R. § 404.1508 (to show a physical impairment such as DJD, the impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings"); *see also* <u>Sellers</u>, 246 F. Supp. at 1211 (M.D. Ala. 2002) ("[o]bjective medical evidence must confirm that the impairment is severe"); Social Security Ruling 96-3p (same).  Lastly, as the court is well aware, Dr. Roberts's diagnoses alone are insufficient to establish severity at step two.  *See, e.g.*, <u>Salles v. Comm'r. of Social Security</u>, 229 Fed. Appx. 140, 145 (3d Cir. 2007) (diagnoses alone, including diagnosis of depression, insufficient to establish severity at step two).

Thus, in summary, each of the ALJ's findings substantially support his overall finding at step two that Plaintiff's knee condition was not a severe impairment, as Plaintiff has not met his burden of establishing that the condition significantly limited his physical ability to perform basic work activities for a continuous period of twelve months.  Accordingly, the ALJ did not err.

---

[8] While diagnostic testing may not be necessary to establish the presence of bursitis, the record establishes that this condition did not exist for a continuous period of twelve months.

B.      Opinions of Dr. Roberts

Plaintiff next contends that the ALJ erred in rejecting the opinions of Dr. Roberts, a treating physician, and in a related argument, contends that the ALJ erred in finding Plaintiff capable of performing medium and light work (because the latter findings are based on the ALJ's rejection of Dr. Roberts's opinions).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439–41 (11th Cir. 1997); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991); <u>Sabo v. Chater</u>, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* <u>Wilson v. Heckler</u>, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).

Here, the ALJ acknowledged the opinions of Dr. Roberts on the Clinical Assessment of Pain forms and the PCE, as well as his opinions that Plaintiff was "completely disabled," but the ALJ declined to assign "determinative evidentiary weight" to the opinions, and he articulated his reasons for declining to do so (*see* Tr. 26–28, 35–36).

The ALJ first noted that the "severe restrictions" on the PCE, which limit Plaintiff to less than a full range of sedentary work, were not supported by objective medical evidence (Tr. 35–36). Indeed, Dr. Roberts did not order or review diagnostic tests, such as MRIs or CT scans, that revealed Plaintiff's condition <u>during the time he was treated by Dr. Roberts</u>. Although Dr. Roberts indicated he had reviewed the results of Dr. Vogel's diagnostic testing (*see, e.g.*, Tr. 405), the record reveals that Dr. Vogel's testing occurred prior to Plaintiff's surgery. For example, as Plaintiff points out (*see* Doc. 16 at 13), on April 1, 2004, Dr. Roberts reviewed some of Dr. Vogel's records and noted that Plaintiff had "significant anterior and posterior spondylitic changes at C5-6 and C6-7 with a 2-3 mm posterior and inferior disc herniation at both levels" (*see* Tr. 405). This, however, is a verbatim quote of the radiologist's impression regarding the cervical spine MRI taken on August 12, 2002, <u>prior to</u> Plaintiff's cervical fusion (*compare* Tr. 346 *with* Tr. 405). Similarly, Dr. Roberts stated on July 12, 2004, that although Plaintiff had surgery, he "still has spondylitic changes on MRI" (Tr. 441), but he did not note the date on which the MRI (to which he was referring) was taken, and the file contains no evidence of any MRIs taken after the date of Plaintiff's surgery or evidence that Dr. Roberts ordered MRIs during the time he treated Plaintiff.[9] Moreover, on June 6, 2005, Dr. Roberts

---

[9] As the ALJ correctly observed:

Although diagnostic studies performed <u>prior to</u> [Plaintiff's] surgery confirmed the existence of [DDD]

noted that he did not have all of Plaintiff's records "as of yet" and did not know whether Plaintiff had undergone a "lumbar laminectomy or not" (Tr. 473–74), but he continued to offer opinions without reviewing all of Plaintiff's records and without knowing the nature or particulars of Plaintiff's prior surgeries. Thus, the ALJ correctly noted that Dr. Roberts's opinions were not supported by objective medical evidence.[10]

Next, the ALJ stated that Dr. Roberts's opinions regarding the level of pain Plaintiff experienced were inconsistent (Tr. 36). As noted *supra*, during the course of Plaintiff's treatment, Dr. Roberts completed three Clinical Assessment of Pain forms. On the first form, dated April 1, 2004, Dr. Roberts opined that Plaintiff's pain was "present and found to be intractable and virtually incapacitating" (Tr. 392). He also stated that Plaintiff's medications can cause side effects which impose some limitations but not to such a degree to cause serious problems in most instances (*id.*). On the second form, dated November 5, 2004, Dr. Roberts estimated that Plaintiff's pain was "present to such an extent as to be distracting to the adequate performance of daily activities or work"; that "physical activity, such as walking, standing, sitting, bending, stooping, moving of extremities, etc.," would greatly increase Plaintiff's "pain and to such a degree as to cause distraction from task or total abandonment of a task"; and that medication side effects could be expected to be significant and to limit Plaintiff's "effectiveness due to distraction, inattention, drowsiness, etc." (Tr. 434).[11] On the third form, dated October 13, 2005, Dr. Roberts indicated that Plaintiff's pain was "present to such an extent as to be distracting to the adequate performance of

---

of the cervical and lumbar spine, <u>there have been no additional diagnostic studies performed</u> and, hence, no objective diagnostic evidence of recurrent herniations, or other severe acute or chronic vertebrogenic related disorders such as nerve root impingement, spinal stenosis, or facet joint hypertrophy.

(Tr. 37) (emphasis added).

[10] Plaintiff repeatedly states that objective medical evidence supports the opinions of Dr. Roberts, but the evidence to which Plaintiff refers is evidence that was obtained before Plaintiff's surgery (*see* Doc. 16 at 13–22 (referencing, for example, pre-surgery MRIs)).

[11] On November 9, 2004, four days after the second pain form was completed, another form (or at least a portion thereof—the form begins with a question numbered eight) was completed. On this untitled form Dr. Roberts offered several opinions, including an opinion that his patient experiences "moderately severe" levels of pain based on past treatment for the left hip (*see* Tr. 435). Plaintiff's name is not written on this form, and it appears that this form does not pertain to Plaintiff because the record does not reflect that he was treated for issues related to his left hip.

work activities" and that medication side effects can be expected to be severe and to limit Plaintiff's effectiveness due to distraction, inattention, or drowsiness (Tr. 463). Additionally, on October 13, 2005, Dr. Roberts completed a PCE form (Tr. 462). In relevant part, Dr. Roberts opined that Plaintiff could sit up to four hours at a time and four hours total in an eight-hour workday, "stand/walk combined" for up to one hour at a time and one hour total in an eight-hour workday, lift or carry up to twenty pounds, and bend or reach (*id.*). Plaintiff, however, was precluded from pushing or pulling arm controls, using his feet for repetitive movements, and squatting, crawling, or climbing (*id.*).

Thus, as the ALJ noted, Dr. Roberts first described Plaintiff's pain as "virtually incapacitating," but Dr. Roberts later, and inconsistently, twice indicated that Plaintiff's pain was merely "distracting" to the performance of daily activities or work. Moreover, the opinions suggest an improvement in Plaintiff's pain over time, but Dr. Roberts's treatment notes do not document improvement in Plaintiff's pain, and thus, as the ALJ intimated, the treatment notes are inconsistent with the pain forms. Additionally, a report from Dr. Roberts's clinic, dated November 16, 2004, notes that Plaintiff had no functional limitations in activities of daily living, such as shopping, dressing, or preparing meals; was presently in no pain; and had not experienced pain in the last week(s) or months(s) (Tr. 436).[12] As the ALJ noted (*see* Tr. 36), these opinions are clearly inconsistent with the opinions on the pain forms. Similarly, the opinions on the pain forms regarding the side effects of Plaintiff's medication are inconsistent. On the first form Dr. Roberts noted that side effects would impose "some limitations"; on the second form he indicated side effects would be "significant"; and on the third form he indicated that side effects would be expected to be "severe." However, the treatment records do not reflect substantial adjustments to Plaintiff's medications that would cause increasingly severe side effects, and the records contain no indication that Plaintiff ever complained of side effects to any degree, much less a severe degree. For all of these reasons, the ALJ's finding that the opinions on the pain forms are inconsistent is substantially supported by the record.

---

[12] Unlike the form dated November 9, 2004 (referenced in footnote eleven, *supra*), the form dated November 14, 2004, is a complete form, and it contains Plaintiff's name, as well as height and weight information that is consistent with Plaintiff's physique (*see* Tr. 436).

The ALJ additionally, and correctly, noted that the opinions of Dr. Roberts that Plaintiff was "totally disabled" were not entitled to controlling weight or special significance (Tr. 36). Indeed, the question of whether a claimant is disabled, that is, unable to work within the strictures of the Act, is reserved to the Commissioner, not to a physician. *See* 20 C.F.R. § 404.1503.

The ALJ next stated that the opinions of Dr. Roberts, a family practitioner, were inconsistent with the opinions of Dr. Vogel, Plaintiff's neurologic surgeon (Tr. 36), another finding with substantial support in the record. Dr. Vogel opined that Plaintiff would likely be disabled for approximately three to six months following his surgery in January 2003 (Tr. 314). Consistent with this estimation, Dr. Vogel opined in February and May 2003 that Plaintiff was unable to work (*see* Tr. 356, 378). However, in April 2004, which is the same month Dr. Roberts completed the first pain form and described Plaintiff's pain as intractable and virtually incapacitating, Dr. Vogel opined that Plaintiff's pain was present but did not prevent functioning in everyday activities or work (Tr. 432). Dr. Vogel also opined in April 2004 that Plaintiff could lift, push, or pull up to fifty pounds (Tr. 433). As can be seen, Dr. Vogel's latter opinions are indeed inconsistent with the opinions of Dr. Roberts, and the ALJ did not err in considering the inconsistencies.

Additionally, albeit in the context of evaluating Plaintiff's credibility, the ALJ discussed Plaintiff's follow-up visit with Dr. Vogel, just six weeks following his surgery, at which time Plaintiff characterized his pain as "mild" (*see* Tr. 37, 358). The ALJ also noted that any suggestion that Plaintiff suffered from disabling pain or functional limitations was belied by the examination of Dr. Koulisis, a board certified orthopedic surgeon (the results of which are described fully, *supra*) (*see* Tr. 37, 407–13). The ALJ also noted that following Plaintiff's surgery he had no hospitalizations or emergency room visits, including during the time he was treated by Dr. Roberts (Tr. 37).

Lastly, the ALJ stated that Dr. Roberts's opinions on the PCE are "undermined by the fact he has continuously prescribed [Plaintiff] narcotic pain medications without obtaining x-rays or documenting other objective medical evidence of a disorder capable of producing disabling pain" (Tr. 36). To the extent the ALJ considered the lack of objective medical evidence to support Dr. Roberts's opinions, the ALJ did not err. The court notes, however, that during Plaintiff's hearing the ALJ made the following, similar, comment:

> Dr. Roberts reports [sic] are noted and ignored. For the fact Dr. Roberts has not seen
> fit to do anything other than to prescribe pain medication. No objective, I'm sorry,
> no x-rays were taken and that's a problem that I have found with Dr. Roberts over
> the years because of the way he practices medicine and he's a good prescriber of
> narcotic medicines.

(Tr. 547).

To the extent the ALJ found, without any support in the record, that Dr. Roberts has a pattern or practice of prescribing pain medication without cause, the ALJ erred. Similarly, to the extent the ALJ concluded that Dr. Roberts should not have prescribed pain medication without obtaining diagnostic tests, the ALJ erred because he effectively substituted his opinion for the opinion of Dr. Roberts as to the proper course of Plaintiff's treatment. However, even if the ALJ erred in this regard, the error is harmless. All of the other factors articulated by the ALJ are well founded, supported by the record, and when considered together, provide a substantial basis for discounting the opinions of Dr. Roberts. *See* Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . ."); *see also* East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard).

Thus, in summary, the undersigned concludes that ALJ clearly articulated his reasons for rejecting the opinions of Dr. Roberts. With the exception of one reason (potentially), the reasons stated by the ALJ are supported by substantial evidence in the record, and Plaintiff is not entitled to reversal on this ground. Moreover, having properly discounted the opinions of Dr. Roberts, the ALJ did not err in assigning "determinative evidentiary weight" to the opinions of Dr. Koulisis (Tr. 35). Although the opinion of a consultative examiner is not entitled to the same degree of weight as that of a treating physician, where substantial record evidence supports the ALJ's decision to discount a treating physician's opinion, the opinion of an examining physician itself becomes entitled to significant weight. *See* 20 C.F.R. § 404.1527(d); Richardson v. Perales, 402 U.S. 389,

91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (report of consultative examiner may constitute substantial evidence supportive of a finding adverse to a claimant).[13]

Notwithstanding, Plaintiff contends that Dr. Koulisis's findings "defy logic," and the ALJ erred in relying on those findings because only five months after Dr. Koulisis "basically found nothing significantly wrong with Plaintiff," a cervical spine MRI revealed abnormalities at the C2-3, C3-4, and C5-6 levels, as well as spondylitic changes, disc herniation, and encroachment on the neural foramina at certain cervical levels (Doc. 16 at 21–22). Plaintiff's argument, however, is misplaced. Dr. Koulisis's examination occurred on September 1, 2004 (*see* Tr. 407), and in a treatment note dated February 15, 2005, Dr. Roberts reported that Plaintiff's "past medical history" included a cervical MRI that showed the aforementioned findings (Tr. 482). The MRI to which Dr. Roberts referred in February 2005, however, was taken prior to Plaintiff's January 2003 surgery. Accordingly, the undersigned finds no error regarding the ALJ's consideration of, and reliance on, the opinions of Dr. Koulisis.

C.     Hypothetical Questioning of the Vocational Expert

As Plaintiff's last ground for relief, he contends the ALJ erred by posing a hypothetical question to the Vocational Expert ("VE") that was deficient, confusing, and required the VE to "interpret medical evidence" (Doc. 16 at 5–6).

At step five of the sequential evaluation, the Commissioner has the burden of proving "there is other work in the national economy that the claimant can perform." Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir.1996). "If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled." Phillips, 357 F.3d at 1239. To

_____

[13] The ALJ also assigned determinative evidentiary weight to the more recent opinions of Dr. Vogel, noting that Dr. Vogel had an established treating relationship with Plaintiff, he was well qualified in his area of practice, and his opinions were consistent with those of Dr. Koulisis (*see* Tr. 35). Plaintiff appears to contend, however, that the ALJ also erred in this regard (*see* Doc. 16 at 22). In support, Plaintiff relies on the earlier remand order of the Appeals Council which noted that Dr. Vogel limited Plaintiff to less than sedentary work (*id.*; *see also* Tr. 105), a conclusion that is inconsistent with the ALJ's finding here that Plaintiff was capable of performing medium and light work. As previously noted, however, the opinions of Dr. Vogel limiting Plaintiff to less than sedentary work were rendered within six weeks and four months of Plaintiff's surgery, before Plaintiff had fully recovered (Tr. 356, 378). Dr. Vogel subsequently opined that Plaintiff could lift up to fifty pounds and function in everyday activities or work (Tr. 432–33), and those opinions were not part of the record at the time of the remand order. Moreover, as a treating physician, Dr. Vogel's opinions must have been assigned controlling weight, as the ALJ did here, unless good cause existed to do otherwise.

determine whether a claimant can adjust to other work, an ALJ can utilize a VE, and the ALJ must pose hypothetical questions to the VE to determine whether someone with the same limitations as the claimant will be able to secure employment in the national economy. *Id.* at 1240. The hypothetical questions must include "all of the claimant's impairments." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002). Stated another way, a hypothetical question must comprehensively describe the claimant's condition, and VE testimony that does not accurately address that condition cannot be considered substantial record evidence. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported. *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

A review of the VE's testimony, although lengthy, is helpful to an analysis of Plaintiff's claim. The VE first stated that she was present throughout Plaintiff's hearing and had previously read his file (Tr. 544). She then characterized Plaintiff's past relevant work as a laborer/construction worker two (unskilled, with a medium to heavy exertional level—depending on how Plaintiff actually performed the job), fisherman (unskilled, heavy), and prison worker, such as dishwasher or trash collector (unskilled, light to medium) (*id.*). The VE also testified that Plaintiff had no transferrable skills from his past work (Tr. 544–55). The ALJ then asked the VE to consider an individual of Plaintiff's age, who—although he had a high school education—was functionally illiterate, and who had Plaintiff's past work as a laborer and fisherman (Tr. 545). The VE was further asked to assume that the hypothetical individual had the abilities and limitations assessed by Dr. Koulisis (*see* Tr. 545–47)[14] and Dr. Vogel (*i.e.*, as expressed in Dr. Vogel's most recent opinions) (Tr. 547). Continuing, the ALJ stated that the opinions of Dr. Roberts should be ignored (as quoted *supra*), as well as those of Dr. Richard E. Doll, a psychological consultative examiner

---

[14] Although this portion of the hypothetical question was lengthy, the ALJ was essentially reading from the report and physical capacities assessment prepared by Dr. Koulisis (*compare* Tr. 407–13 *with* Tr. 545–47).

(Tr. 547–48),[15] but the VE was asked to consider the opinions of Cynthia Javellana, M.D.[16] Specifically, with regard to Dr. Javellana, the ALJ stated:

> ALJ [referring to Exhibits 34F and/or 37F (duplicate copies of Dr. Javellana's questionnaire)]. As far as maintaining social functioning it's clearly a moderate restriction as opposed to none, slight, marked and extreme, it's moderate. Again deficiencies in concentration, persistence and pace resulting in a failure to complete in a timely manner, work setting or elsewhere, she's got moderate over to marked. So she gave it a full moderate and a full marked. It's a, it's kind of an iffy iffy but you've got to take it that way. The rest of them are either moderate or slight to moderate or slight.
>
> Deterioration or decompensation of work, work like settings is moderate. Evaluation of psychiatric status and the ability to do the following on a sustained basis and routine work setting, understand, carry and remember instructions was slight to moderate. Respond appropriately to supervision, slight. Respond appropriately to co-workers in a work setting slight to moderate. Perform simple tasks in a work setting, slight. To perform repetitive tasks in a work setting, slight. And gives this man a GAF of 50 and says that he has major depressive disorder, moderate, recurrent with psychotic feature, mood disorder secondary to chronic pain.
>
> Psychotic disorder and GAF of 50 and says he's stable with treatment, he's getting treatment. Now let's kind of limit him to exactly what he's been doing, unskilled, simple, one-two step and I'm going to note that because his past relevant work is unskilled, simple, one-two step and he's on the circuit case right on point that talks about people with limited IQs and I'm going to assume that there is a limit IQ [sic]. I'm going to further assume that he has functioned in the past, he's functioned in the present community which you have to, no laying around Limestone.[17] Went down to Locksley down in Baldwin County work house and they

---

[15] Plaintiff does not contend that the ALJ erred in discounting the opinions of Dr. Doll.

[16] Shortly after Plaintiff's cervical fusion, he was admitted to the Crisis Stabilization Unit of Lakeview Center and treated by Dr. Javellana (*see* Tr. 29). Plaintiff was discharged three days later, and returned to see Dr. Javellana on an out-patient basis through April 2005. Dr. Javellana completed a Residual Functional Capacity Questionnaire on October 31, 2005 (Tr. 459 (Exhibit 34F)). In relevant part, she opined that Plaintiff had only slight, slight to moderate, or moderate limitations in eight areas of functioning (Tr. 459). In one area (*i.e.*, "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner") she opined that Plaintiff had moderate to marked limitations (Tr. 459). Additionally, she assessed a Global Assessment of Functioning ("GAF") score of 50 (a score between 41 and 50 generally indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994)).

[17] Plaintiff previously testified that he served approximately eight years in prison in Alabama, and he was incarcerated, at various times, in facilities he referred to as "Limestone," "Locksley," and "Flower Wood" (*see* Tr. 528–31).

sent him over to Flower Wood. No laying around Flower Wood because they'll send you right back over there. If you're not working, Barry wouldn't put up with it. You know Mr. Barry, don't you?
CLMT [Plaintiff]. Yes, sir.
ALJ. Yes, sir, you do. How did I know that name? I know him, too.
CLMT. Yes sir.
ALJ. Yes, sir. Barry would have sent him right back over to the county workhouse and then he would go right back up to Limestone because they wouldn't be happy to hear it. You know he didn't want to do that either.
CLMT. No, sir.
ALJ. Did not want to go to Limestone.
CLMT. Please don't.
ALJ. It was nicer in Locksley. It was, Locksley wasn't a bad deal compared to coming out of Limestone. That was not a good deal. But he did function and with the limitations placed on him I think it's not a full range of medium though because there are some restrictions on the neck motion and, but it's a modified medium to avoid frequent repeated flexion, extension of the neck because of that cervical fusion or repeated bending at the waist.

(Tr. 549–51).

The ALJ then asked the VE whether there were jobs available at the "modified medium" level of exertion, which the ALJ clarified by rephrasing the question as, "Are there jobs that exist at the medium level that do not have the repeated flexion, extension of the neck or repeated bending at the waist?" (Tr. 551). In response, the VE stated that jobs were available, and when asked to identify those jobs, the following exchange occurred:

[VE]. [Y]ou mentioned no stooping and no crawling and you said no so I'm assuming that means . . .
[ALJ]. Lets go back over that because I, you know I might have blurted that out and . . .
[VE]. But that makes a difference.
[ALJ]. – it's been known to happen. Well let's find out. Let me go over, that was Dr. [Koulisis]. He says on the stooping, crouching, kneeling and crawling is occasional.
[VE]. Occasional? Okay.
[ALJ]. Occasional.
[VE]. Okay. That makes a big difference.
ALJ. Yeah, I didn't think I blurted out no stooping but that is --
VE. Okay. That's why I wanted to be clear.
ALJ. – [Dr. Koulisis's report] at page 6, Counselor.
ATTY. Yes, sir. Yes, sir, I'm looking at it.
ALJ. I read that in and, okay.

VE. Okay. Based on that, one job that meets that criteria that is also unskilled, simple and repetitive at the medium, unskilled level is a self-service laundry attendant. There is no stooping required, no crawling. It would meet the criteria in the hypothetical. The numbers for that job nationally are 47, 640. The state of Florida has 2,839. Another job that would meet that criteria would be hand packager and that is generally packaging bakery goods and other food items. Again, unskilled, medium and nationally there are 160, 656. The state of Florida has 6,462. And another job would be fish cleaner and again, that's unskilled, medium. That's divided into retail and wholesale. I'll just put those together. It would be 75, approximately 75,000 jobs nationally and the state of Florida would have approximately 3,000 . . .

(Tr. 551–52).

The ALJ then asked the VE to consider whether work was available at the light exertional level with the same restrictions (i.e., "unskilled, one-two step with the turning of the head and flexion, extension and the other restrictions placed by the [examining and treating] physicians") (Tr. 553).[18] The VE testified that the jobs of arcade attendant (characterized by the VE as "low level, unskilled, light work") and optical goods worker/hand grinder (characterized by the VE as "unskilled light job, low GED") could be performed by such a hypothetical individual (*id.*).

Plaintiff's attorney was then given an opportunity to question the VE, and he asked her to provide the Dictionary of Occupations Titles ("DOT") numbers for the various jobs she identified (Tr. 556–57). He also asked whether functional illiteracy would eliminate the self-service laundry worker job, and the VE stated that it would not because those are simple and repetitive jobs that "basically [involve] taking laundry in and out of the washer and putting it in the dryer and handing dry cleaning to the attendant and that sort of thing" (Tr. 557). The VE also confirmed that illiteracy would not affect most arcade attendant job because attendants are usually not required to make change, but giving Plaintiff "the benefit of the doubt," the available positions might be reduced by only 10% (an insignificant amount according to the VE) (Tr. 557–59). Plaintiff's attorney then asked whether a GAF of 50 would eliminate jobs previously identified by the VE, and in response the VE stated that "50 is generally the cut off area for being able to keep a job," but a score of 50 would not prevent a person from performing a low level, repetitive-type job that does not require

_____

[18] Although the ALJ did not specifically mention Dr. Koulisis and Dr. Vogel by name, it is clear from the exchange that they were the "examining and treating" physicians to whom the ALJ referred.

a "significant amount of thinking and reading and writing and so forth" (Tr. 560). Upon further questioning the VE appears to have acknowledged that if a GAF score of 50 was the only factor considered, all work would be precluded (*see* Tr. 561). The ALJ, however, asked the VE to consider the specific limitations imposed by Dr. Javellana, <u>in addition to the GAF score she assessed</u>, and in response the VE noted that all work would not be precluded. The VE explained that she relies more on functional limitations, such as those assessed by Dr. Javellana, than a GAF score, and she had previously considered the limitations imposed by Dr. Javellana before identifying jobs Plaintiff could perform (Tr. 562).

As grounds for relief, Plaintiff first alleges that the ALJ erred in not including in his hypothetical questions restrictions related to Plaintiff's bilateral sensorineural hearing loss, a condition the ALJ found severe. Initially, the court notes that even when an ALJ finds a severe impairment, it does not necessarily mean there will be functional limitations included in the RFC. *See* <u>McDaniel</u>, 800 F.2d at 1031 ("Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected."); <u>Walters v. Barnhart</u>, 184 F. Supp. 2d 1178, 1184 (M.D. Ala. 2001) (ALJ's finding that claimant suffered from severe impairments "is not tantamount to a conclusion that these impairments imposed significant work-related limitations"). Indeed, a severe impairment is one that is more than "a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." <u>Yuckert</u>, 482 U.S. at 154 n.12. Moreover, the record here does not document significant functional limitations related to Plaintiff's hearing loss. For example, on at least two occasions Plaintiff was interviewed by SSA personnel who specifically noted that Plaintiff had "no" hearing difficulties (*see* Tr. 155, 191). Similarly, Dr. Koulisis reported that Plaintiff had no hearing difficulties (Tr. 412). Although a psychiatric consultative examiner noted that Plaintiff's hearing was "somewhat impaired," the examiner also noted that Plaintiff seemed to be obstinate, answering questions in one or two words, and the examiner was "not sure" what Plaintiff's problem was (Tr. 445). Another consultative examiner noted that it was difficult to communicate with Plaintiff, but the difficulty was based both on Plaintiff's hearing problem and his "apparent lack of motivation" (Tr. 453). Furthermore, although Dr. Roberts diagnosed Plaintiff with hearing loss in the left ear, he characterized the hearing loss as "mild," and his records do not contain any indication of functional

limitations related to the hearing loss (Tr. 441–42). Lastly, no communication problems are apparent from a review of the transcript of Plaintiff's administrative hearing, and Plaintiff—even in his brief before this court—has not identified or alleged any particular communication difficulty that should have been included in the ALJ's hypothetical questions. Accordingly, the undersigned concludes that the ALJ did not err in failing to include hearing limitations in the hypothetical questions.

Plaintiff next contends that the ALJ's questions were confusing, and by virtue of the ALJ's reading to the VE x-ray results and other "medical evidence," as well as the reports of Dr. Koulisis, Dr. Vogel, and Dr. Javellana, the ALJ "required that the [VE] make interpretations of the medical evidence" and "venture outside of her area of expertise" (Doc. 16 at 6–7). A review of the VE's testimony reveals that she was not called upon to make medical interpretations. While it may not have been necessary for the ALJ to describe the physicians' reports in such detail, his doing so provides no basis for reversing the decision below (and Plaintiff offers no support for such a contention). Initially, the undersigned sees no difference between asking a VE to consider limitations contained in a particular exhibit, as is often done, and reading an exhibit to a VE and then asking the VE to consider limitations contained therein. Moreover, the x-ray results and other "medical evidence" mentioned by Plaintiff were contained within the report of Dr. Koulisis (read to the VE by the ALJ), not in a separate exhibit, and again, while it might not have been necessary for the ALJ to read the x-ray results and "medical evidence" as part of his questioning, there simply is no error in his doing so. Indeed, the VE previously read Plaintiff's file, which includes the report and opinions of Dr. Koulisis, so the ALJ's rereading of Dr. Koulisis's report had no harmful effect. Stated simply, the record establishes that the VE was asked to consider limitations and abilities contained in the reports of three physicians. Although limitations within those reports may have been based, in part, on x-rays and medical evidence, the VE's ability to identify jobs based on the limitations was not eroded. Similarly, the VE was not required to "venture outside her area of expertise" to respond to questions of the ALJ that included x-ray results and medical evidence.

To the extent Plaintiff contends the questions were confusing because they were lengthy, contained extraneous information,[19] or included "medical evidence," the court notes that his attorney had an opportunity to clear up any perceived confusion and failed to do so. Although Plaintiff's attorney asked some questions of the VE, the questions were not designed to clarify any confusion that may have been created by the ALJ's questions. *See* White v. Astrue, 240 Fed. Appx. 632, 634 (5th Cir. 2007) ("Because the VE's testimony, which White did not challenge through cross-examination, was elicited by hypothetical questions incorporating the RFC determination, [the ALJ's] reliance [on the VE's testimony identifying a number of occupations White could perform] was proper) (citations omitted); *see also* Carey v. Apfel, 230 F.3d 131, 146–47 (5th Cir. 2000) ("claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing"). Moreover, the VE herself asked for clarification at one point during the ALJ's questioning; thus, she clearly was not afraid to "speak up," and her seeking clarification on only one occasion suggests she was not confused at any other time, despite the ALJ's inclusion of medical evidence and extraneous information in lengthy questions.

Plaintiff also argues that it is unclear which question the VE was answering (*see* Doc. 16 at 7). As noted above, at the end of the first hypothetical question the ALJ summarized that the VE should consider jobs at a "modified medium" level of exertion, excluding those jobs requiring "repeated flexion, extension of the neck or repeated bending at the waist" (Tr. 550–51). Plaintiff appears to contend that this might be construed as a separate hypothetical question, and it is therefore unclear which question the VE answered (Doc. 16 at 7–8). When put in context, however, it is clear that this was not a separate question, but instead, a type of summary statement. Indeed, before responding to the question and statement, the VE asked for clarification of the stooping and crawling limitations (as established by Dr. Koulisis), and those limitations were included much earlier in the ALJ's hypothetical question but not in the summary statement. Thus, the record

---

[19] As an example of the ALJ's including extraneous information in the hypothetical questions, Plaintiff points to his mention of "someone named Barry at Flower Wood" during the questioning (*see* Doc. 16 at 8).

reflects that the VE was asked to consider the opinions of Dr. Koulisis, Dr. Vogel, and Dr. Javellana, in addition to the ALJ's "modified medium" limitation and related exclusions, before identifying jobs that could be performed. Plaintiff similarly contends, based on the same argument (*i.e.*, that the ALJ actually asked two questions, and it is unclear which question the VE answered), that the VE did not consider Dr. Javellana's moderate to marked restrictions in Plaintiff's ability to maintain concentration, persistence or pace, but as just discussed the record refutes this argument. Moreover, the VE explicitly testified that she considered the specific limitations and GAF assessed by Dr. Javellana, and she gave more weight to the limitations than the raw GAF score in concluding that Plaintiff could perform available work. Thus, the VE clearly considered more than just the ALJ's summary statement, which related only to Plaintiff's physical abilities. Although Plaintiff contends, without support and despite the VE's testimony to the contrary, that moderate to marked concentration restrictions would preclude "the production jobs identified" by the VE (*see* Doc. 16 at 8), even if Plaintiff is correct the VE identified additional, "non-production" jobs Plaintiff could perform, such as self-service laundry attendant and arcade attendant. Thus, any error is harmless.

Lastly, Plaintiff contends that the ALJ's second hypothetical question regarding available work at the light exertional level was also improper, contending in relevant part that it is again "unclear as to what limitations were actually considered by the [VE]" (*id.* at 9–10). However, the ALJ specifically stated that the VE was to consider available unskilled light work that could be performed by an individual with the same restrictions as before (*i.e.*, those restrictions imposed by the same examining and treating physicians, Dr. Koulisis, Dr. Vogel, and Dr. Javellana) (*see* Tr. 553). The record of Plaintiff's hearing, as thoroughly detailed *supra*, simply does not support Plaintiff's contention that it is "unclear as to what limitations" the VE actually considered.

In conclusion, Plaintiff is not entitled to relief because the ALJ did not err at step five. The ALJ posed proper hypothetical questions to the VE, the VE is an expert on the kinds of jobs Plaintiff can perform based on his capacity and impairments, and the ALJ was justified in relying on the testimony of the VE in finding Plaintiff not disabled. Phillips, 357 F.3d at 1240.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.  At Pensacola, Florida this 13<u>th</u> day of August 2009.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**